IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
AUGUST 5, 2004 Session

## RONDA GAW BRADY, ET AL. v. JAMES DONALD CALCOTE, ET AL.

Direct Appeal from the Circuit Court for Putnam County
No. 02J0359    John Turnbull, Judge

No. M2003-01690-COA-R3-CV - Filed January 11, 2005

This appeal arises out of a shareholder derivative action brought by Appellant in behalf of
Community Bank of the Cumberlands against the Appellees, the directors and chief financial officer
of the Bank. The trial court granted the Appellee's motion to dismiss and further awarded Appellees
their attorney's fees and the Bank its expenses for a Special Litigation Committee. Appellant seeks
review by this Court, and, for the following reasons, we affirm in part, reverse in part, and remand
for further proceedings consistent with this opinion.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;
Reversed in Part

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S.,
and HOLLY M. KIRBY, J., joined.

David Day, Cookeville, TN; D. Michael Kress, II, Sparta, TN, for Appellant

Daniel H. Rader, III, L. Dean Moore, Cookeville, TN, for Appellees

## OPINION

### Facts and Procedural History

Ronda G. Brady ("Brady" or "Appellant") is a shareholder of Community Bank of the
Cumberlands ("Bank"), a for-profit banking corporation organized under the laws of Tennessee with
offices in Cookeville and Jamestown, Tennessee. Brady also formerly served as a director for the
Bank. While serving as a director for the Bank, Brady received a letter dated September 7, 2001,
from a former director of the Bank, Robin Blaskis ("Blaskis"). Blaskis, who resigned prior to
sending the letter, stated that she discovered what she believed to be "unorthodox lending practices
by an officer of the Bank."

Subsequently, a shareholder's meeting was held on January 15, 2002, where James D. Calcote ("Calcote"), the president, chief executive officer, and a director for the Bank, provided unaudited financial information about the Bank. It is unclear from the record whether all the stockholders at such meeting understood that such figures were unaudited and preliminary.[1] The figures distributed at the January 15, 2002, meeting were more favorable than the results reported by the Federal Deposit Insurance Corporation ("FDIC") and the Bank's auditors later that year.

At the director's meeting on February 12, 2002, the Bank's board of directors allegedly offered Brady $200 per share for each of her 1,825 shares of common stock with the Bank. In return Brady was to resign her position as a director. On February 12, 2002, Brady signed a written resignation as a member of the Bank's board of directors, which became effective as of that date. Subsequent to her resignation, Brady hired The Kelley Group to investigate the Bank's financial statements and analyze any discrepancies between the unaudited financial information presented to the shareholders at the January 15, 2002, meeting and the audited financial statements presented to the FDIC for the same period of time. The Kelley Group's report noted the following discrepancies: (1) total assets reported to the shareholders for the months ending in March, June, September, and December 2001 are more than total assets reported to the FDIC for the same periods; (2) total liabilities reported to the shareholders for the months ending in June, September, and December 2001 are more than total liabilities reported to the FDIC for the same periods; (3) total equity reported to the shareholders for the months ending in March, June, September, and December 2001 are more than the total equity reported to the FDIC for the same periods; (4) assets per employee reported to the shareholders for the months ending in March, June, September, and December 2001 are more than assets per employee reported to the FDIC for the same periods; and (5) using the figures presented to the shareholders at the January 15, 2002, meeting would result in Calcote receiving a higher bonus than if the figures reported to the FDIC were used. (TR vol. 1, p. 53-55). The Kelley Group concluded that such discrepancies between the two sets of financial information "warrant[ed] further investigation."

Shortly after receiving this report, Brady filed a complaint in the Putnam County Circuit Court on August 21, 2002. Such complaint articulated an individual claim against the directors of the Bank based on an alleged oral contract to buy Brady's shares of common stock in return for her resignation and a derivative claim against the directors of the Bank.[2] Brady filed several amendments to her original complaint alleging various actions taken by the Bank's board of

---

[1] Though such information is unclear, the Special Litigation Committee, appointed by the Bank to investigate Brady's shareholder derivative claims, concluded that "any stockholder with general sophistication in business matters would understand that it would be virtually impossible to complete an audit of a bank within 15 days following the end of the accounting year."

[2] Subsequent to Brady filing her complaint, she took a nonsuit as to all claims related to her oral contract claim, which the trial court acknowledged and dismissed such claims in an order filed on November 14, 2002. Therefore, we do not address any issues involving the validity of Brady's claim based on the alleged oral contract with the Bank's board of directors.

directors, either as a body or separate individuals.[3]  In sum, Brady's complaint stems from the following events: the discrepancies between the financial information presented to the shareholders at the January 15, 2002, meeting and the information presented to the FDIC; Calcote allegedly revealed confidential information of the Bank to a third party; Calcote allegedly illegally received a bonus; the directors allegedly violated an "agreement" to defer payment of the $100 monthly director's fee until the Bank became profitable; and customers of one of the director's automobile dealership allegedly received more favorable treatment.

Upon the motion of the directors of the Bank, the trial court stayed the shareholder derivative action pending the report of a Special Litigation Committee ("SLC").[4]  After the SLC investigated the allegations of Brady's complaint and amended complaints, it concluded that such allegations "lacked substance in law and in fact" and stated in its report that she alleged "nothing that would warrant the undertaking of expensive and disruptive litigation by the Bank."  As a result, the trial court sustained the directors' motion to dismiss and further ordered Brady to pay the defendants' expenses, including their attorney's fees and the expenses for the SLC.  Brady filed an appeal to this Court and presents the following issues, as we perceive them, for our review:

I.      Did the trial court err when it accepted the conclusion of the SLC report;
II.     Did the trial court err when it determined that Brady brought the shareholder derivative action "without reasonable cause" and further abused its discretion by awarding expenses and attorney's fees to the directors of the Bank; and
III.    Did the trial court err when it awarded the Bank and the directors the expenses for the SLC.

For the following reasons, we affirm in part, reverse in part, and remand for any further proceedings consistent with this opinion.

## Standard of Review

When a trial court sits without a jury in a civil action, this Court reviews its findings of fact *de novo* upon the record of the court, affording such findings a presumption of correctness unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d).  However, for questions of law, the scope of review is *de novo* with no presumption of correctness afforded to the trial court's conclusions of law.  *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

---

[3]     We note that Brady subsequently withdrew the second amended complaint she filed on November 13, 2002.

[4]     The trial court allowed discovery to continue for issues related to Brady's oral contract claim. However, as noted above, Brady subsequently took a nonsuit for such issues.

**Special Litigation Committee Report**

First, Appellant argues that the trial court erred when it approved the report and conclusions submitted by the SLC. This Court has previously addressed the procedure with respect to reviewing a special litigation committee's recommendation. The party seeking dismissal of a shareholder derivative suit based on the recommendation of a special litigation committee has the burden of proving four factors: (1) the special litigation committee's independence; (2) good faith of the special litigation committee; (3) the special litigation committee's procedural fairness; and (4) the soundness of the special litigation committee's conclusions and recommendations. *Lewis v. Boyd*, 838 S.W.2d 215, 225 (Tenn. Ct. App. 1992) (citing *Houle v. Low*, 556 N.E.2d 51, 58 (Mass. 1990)).

When evaluating a special litigation committee's independence,

> the court should consider, among other relevant matters: (1) the size of the committee, (2) the committee members' relationship with the corporation's officers and directors, (3) the committee members' qualifications and experience, and (4) the scope of the committee's authority, and (5) the committee's autonomy from the directors, officers, and corporate counsel.

*Id.* at 224. In this case, it appears to be undisputed that the SLC's members were independent of the corporation and its directors. The SLC appointed in this case was a committee of two members, Jon E. Jones ("Jones") and Robert M. Duncan, Jr. ("Duncan"). This Court in *Lewis* approved of a special litigation committee of two members, and, therefore, we cannot say that the size of the SLC in this case indicates that the SLC was not independent because it was "large enough to prevent control by the board and was made up of persons who had no interest in the transactions at issue." *Id.* at 225. Jones and Duncan each stated that they were totally independent of the Bank and that neither they nor any member of their immediate families were shareholders, depositors, directors, officers, or employees of the Bank. Additionally, Jones is an attorney with experience in cases involving unsound banking practices, and Duncan is a certified public accountant with over twenty-five years of experience in auditing community-based banking institutions. After our review of the record, it is clear that the SLC was "independent" within the contemplation of *Lewis v. Boyd*.

Additionally, we cannot say that the SLC members lacked good faith while acting in such capacity. The SLC members spent several months investigating Brady's allegations in her complaint and amended complaints. They conducted several interviews of the parties involved including Calcote, the compliance officer with the Bank, David Rader, who was the counsel for the directors and the Bank, and Michael Stone, who was another director of the Bank's board. Though the SLC attempted to interview Brady, she refused to speak with the SLC; therefore, the SLC met and spoke with Brady's attorney, D. Michael Kress, II. Additionally, the SLC members reviewed various documents including FDIC reports and financial statements of the Bank for the period at issue. Therefore, the record supports the conclusion that the SLC attempted in good faith to obtain all pertinent information.

When reviewing whether a special litigation committee exhibited procedural fairness and adequately investigated the allegations of a complainant shareholder, the court should examine "(1) the length and scope of the investigation, (2) the committee's use of independent counsel or experts, (3) the corporation's or the defendants' involvement, if any, in the investigation, and (4) the adequacy and reliability of the information supplied to the committee." *Id*. at 224. Again, as noted above, the trial court stayed all proceedings pertaining to the shareholder derivative action, and the SLC's investigation commenced in October 2002. This investigation concluded at the end of January 2003, at which time the SLC drew up its report for the court. The SLC's investigation was rather broad in scope. It encompassed interviews with Calcote, Elaine Chaffin, who was the compliance officer with the Bank, David Rader, who was counsel for the directors and the Bank, D. Michael Kress, II, who was Brady's counsel, and Michael Stone, chief financial officer for the Bank. Although the SLC did not interview Brady herself, it was through no fault of their own as Brady refused an interview with the SLC. Additionally, as we observed earlier, the SLC reviewed documentation including FDIC reports and financial statements of the Bank for the period at issue. Further, the SLC interviewed independent experts by questioning directors for other local banking corporations. As for the defendants' or the Bank's involvement in the SLC's investigation, the trial court found, and the record supports, that there was no evidence the defendants or the Bank impeded the SLC's investigation, and it appears the SLC had unfettered access to the pertinent records of the Bank. Finally, there is no evidence in the record to suggest that the information relied upon by the SLC for its conclusions was inadequate or unreliable. In fact, it is the lack of information to support Brady's allegations that guides the SLC to its conclusion.

Finally, a court should examine the soundness of the special litigation committee's conclusions and recommendations.

> When considering whether the committee has reached a reasoned and principled decision that is in the corporation's best interests, the court should consider: (1) the likelihood that the plaintiff will succeed on the merits, (2) the possible financial burden on the corporation compared with the litigation costs, (3) the extent to which dismissal will permit the defendants to retain improper benefits, and (4) the effect continuing the litigation will have on the corporation's business reputation and good will.

*Id*. at 224-25 (citing *Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990)). While a court's review should extend to the rationale of the committee's decision, "we stop short of authorizing the reviewing court to substitute its own business judgment for the committee's as the Supreme Court of Delaware did in *Zapata Corp. v. Maldonado*." *Id*. at 224.

In this case, when determining whether the SLC's recommendation that Brady's suit be dismissed is consistent with the Bank's best interest, we first note that there is little likelihood that Brady would succeed on the merits. First, with respect to her claim arising out of the alleged wrongful payment of a bonus to Calcote based on an unaudited financial statement, we agree that there is no evidence that such a bonus was ever paid. We also note that the SLC interviewed Brady's

counsel who "acknowledged that Ms. Brady had no information that any such bonus has been paid." Additionally, because there is no evidence that Calcote was paid a bonus, discontinuing a shareholder derivative action on this claim would not permit Calcote to retain an improper benefit.

Second, with respect to the financial information distributed at the January 15, 2002, shareholder's meeting, we begin by noting that the SLC found no evidence of any damages suffered by the shareholders as a result of these preliminary figures. As noted above, there was no evidence that Calcote took advantage of these more favorable figures to obtain a higher bonus. Further, the SLC concludes that, while it is unclear whether the shareholders understood that the figures presented at such meeting were preliminary, "any stockholder with general sophistication in business matters would understand that it would be virtually impossible to complete an audit of a bank within 15 days following the end of the accounting year." Additionally, Jones noted that with each audited financial statement, there is a certification from a certified public accounting firm showing on the document's face that it represents audited figures. If such certification does not appear, as in this case, it indicates that the figures are not audited.

Third, Brady claims that Calcote improperly disclosed confidential information to a third party. The SLC first noted, and we agree, that "[t]he complaint does not provide any details for this allegation nor does it assert that the Bank suffered any financial loss as a result of such disclosure." However, the SLC determined that such allegation is rooted in statements by Robin Blaskis. Blaskis was closely associated with a former Bank officer who had a history of making bad loans. Additionally, Calcote also replaced information systems that Blaskis recommended because he found they were not secure. Therefore, the SLC determined "[t]here is no *credible* evidence that Mr. Calcote has improperly disclosed any of the Bank's confidential information" and Brady does not suggest how the Bank suffered damages as a result of the alleged improper disclosure. (emphasis added).

Fourth, Brady claims that the directors of the Bank were improperly paid a $100 monthly fee because the Bank was still unprofitable and the directors agreed to defer such fees until the Bank became profitable. But the directors had continuing authority to revisit this issue at a further meeting. Additionally, the SLC discovered that the Bank, in its "offering circular" for potential shareholders, explains that directors would receive a monthly director's fee for the first year of the Bank's operation. Further, the directors agreed that such fees would be deferred until the corporation became profitable, however, the liability for those fees would still be accrued on the accounting records. In July 2002, the directors voted to pay the deferred fees through July 2002. In this case, it appears that the benefit of pursuing a claim against the directors for the return of these fees would likely outweigh the cost to the Bank of bringing a shareholder derivative suit. In addition, given the potential personal financial exposure of the directors of the Bank, the $100 monthly fee does not appear to be an improper benefit.

Finally, with respect to Brady's claim that William L. Dunn ("Dunn"), a director for the Bank, permitted favorable treatment for the customers of his automobile dealership, the SLC, after its investigation, determined there was no basis for a shareholder derivative claim against Dunn or

the board of directors. The SLC discovered that out of the over 1,000 private vehicle loans made by the Bank, the Bank had charged off only seventeen of those loans. Only one of those seventeen loans was made to finance a vehicle purchased from Dunn's automobile dealership. The vehicle for that loan was repossessed, resold, and the Bank was garnishing the wages of the borrower to fulfill the remaining balance due. Based on the circumstances of this case, we cannot say that the trial court erred when it determined that the SLC's conclusions and recommendations were sound. For these reasons, the trial court did not err when it approved the report and conclusions of the SLC.

## Without Reasonable Cause

Next, Brady argues that the trial court erred when it determined that she brought her shareholder derivative claim against the defendant directors "without reasonable cause," and, additionally, the trial court abused its discretion when it awarded the directors their expenses, including attorney's fees. Section 48-17-401(d) of the Tennessee Code, which addresses proceedings in shareholder derivative actions, provides that "[o]n termination of the proceeding, the court may require the plaintiff to pay any defendant's reasonable expenses (including counsel fees) incurred in defending the proceeding if it finds that the proceeding was commenced without reasonable cause." Tenn. Code Ann. § 48-17-401(d) (2002).

As an initial matter, we note that, because of the word "commenced" in the statute, a trial court should evaluate whether a plaintiff had reasonable cause at the time the complaint was filed and not at any future point in time. Tenn. Code Ann. § 48-17-401(d) (2002); *see also Owen v. Modern Diversified Indus., Inc.*, 643 F.2d 441, 444-45 (6th Cir. 1981) (approving of the district court's interpretation of the Tennessee statute examining plaintiff's knowledge of the suit "at the outset" of the action); *Blumenthal v. Teets*, 745 P.2d 181, 189 (Ariz. Ct. App. 1987) (concluding the plaintiff did not have "reasonable cause for the filing of this complaint"); *White v. Banes Co.*, 866 P.2d 339, 343-44 (N.M. 1993) (examining whether the plaintiff knew "when he filed the action" that his complaint was without reasonable cause); *Bass v. Walker*, 99 S.W.3d 877, 885 (Tex. App. 2003) (utilizing a standard which examines whether the plaintiff acted without reasonable cause "at the time he brings suit").

We are mindful that there are no Tennessee court cases defining the phrase "without reasonable cause" as it is used in section 48-17-401(d) of the Tennessee Code. Few other jurisdictions that have a statute with similar language have confronted the issue of what "without reasonable cause" means. When the North Carolina Court of Appeals was presented with this question in *Lowder v. Doby*, 340 S.E.2d 487 (N.C. Ct. App. 1986), the court assumed *arguendo* that the appellant's definition of "without reasonable cause" applied and still found the plaintiff filed the shareholder derivative action "without reasonable cause."[5] *Id*. at 493-94.

---

[5] In *Lowder v. Doby*, the plaintiffs argued that to have "reasonable cause" to bring a shareholder derivative suit, "they need only have a 'reasonable belief' that there is a 'sound chance' that their claims may be sustained." *Lowder*, 340 S.E.2d at 493.

In *Blumenthal v. Teets*, 745 P.2d 181 (Ariz. Ct. App. 1987), the court held that "reasonable cause" was synonymous with "good cause" as it was used in Rule 11 of the Federal Rules of Civil Procedure.[6] *Id.* at 188-89. In essence, a plaintiff had "good cause," and, therefore, "reasonable cause," if they were satisfied that there were good grounds for the action. *Id.* (citing *In re Ramada Inns Sec. Litig.*, 550 F.Supp. 1127, 1132 (D. Del. 1982)). In *Blumenthal*, the court held that a plaintiff may not blindly rely on a *Wall Street Journal* article regardless of its content, that nothing in the article constituted "reasonable cause," and that such action constituted the filing of a suit "without reasonable cause." *Id.* at 189.

In *Bass v. Walker*, 99 S.W.3d 877 (Tex. App. 2003), the Texas Court of Appeals was also presented with the question of what "reasonable cause" means in the context of a shareholder derivative claim. After reviewing case law from other jurisdictions, the court adopted an objective standard and held

> [A] plaintiff acts without reasonable cause under article 5.14F if, at the time he brings suit: (1) plaintiff's claims in the lawsuit are not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; or (2) plaintiff's allegations in the suit are not well grounded in fact after reasonable inquiry."

*Id.* at 885 (citation omitted). This standard is the standard codified in the Model Business Corporation Act § 7.46(3) for determining when a party may be ordered to pay an opposing party's reasonable expenses, including attorney's fees.[7] *Id.*; *see also* Model Bus. Corp. Act § 7.46(3) (1999).

In *Owen v. Modern Diversified Indus., Inc.*, 643 F.2d 441 (6th Cir. 1981), the Sixth Circuit Court of Appeals, in adopting a district court's interpretation of "without reasonable cause" in the prior Tennessee statute dealing with the procedure in shareholder derivative actions, held that "without reasonable cause" means that "it should have been obvious to the plaintiff at the outset" that no claim in behalf of the corporation existed. *Id.* at 444-45. The court further held that the trial court did not abuse its discretion when it awarded only partial fees to the defendants because plaintiff did not commence the action in bad faith. *Id.*

---

[6]     Rule 11 of the Federal Rules of Civil Procedure concerns the presentation of signed pleadings, motions, and other papers to a court. Fed. R. Civ. P. 11.

[7]     We note that section 7.46(3) of the Model Business Corporation Act concerns the payment of an opposing party's expenses "because of the filing of a pleading, motion or other paper . . . not well grounded in fact, after reasonable inquiry, or warranted by existing law or a good faith argument for the extension, modification or reversal of existing law . . . ." Model Bus. Corp. Act § 7.46(3) (1999). Such section concerns the filing of pleadings, motions, or other papers which encompasses the same subject as Rule 11 of the Federal Rules of Civil Procedure, which was applied in *Blumenthal v. Teets*, 745 P.2d 181 (Ariz. Ct. App. 1987).

Finally, in *White v. Banes Co.*, 866 P.2d 339 (N.M. 1993), the New Mexico Supreme Court examined the comment to section 7.46(2) of the Model Business Corporation Act which states that the section for assessing fees against a plaintiff bringing suit "without reasonable cause" "is appropriate to deter strike suits, on the one hand, and on the other hand to protect plaintiffs whose suits have a reasonable foundation." *Id.* at 343 (quoting Model Bus. Corp. Act § 7.46 cmt. (1984)). The court went on to equate "without reasonable cause" with "groundless" as it has been interpreted by New Mexico courts. *Id.* at 343-44. It applied a subjective standard and held that the plaintiff brings a shareholder derivative action if the plaintiff "knew when he filed the action that his complaint was without a reasonable foundation[.]" *Id.* at 343-44.

After reviewing the case law on the subject, we hold that the standard utilized by the Texas appellate court most effectively strikes a balance in deterring strike suits, on the one hand, and protecting plaintiffs' suits with a reasonable foundation on the other. *See* Model Bus. Corp. Act § 7.46 cmt. (1999). Therefore, we hold that a plaintiff acts without reasonable cause under section 48-17-401(d) of the Tennessee Code if, at the time the plaintiff brings suit: (1) plaintiff's claims in the lawsuit are not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; or (2) plaintiff's allegations in the suit are not well grounded in fact after reasonable inquiry. *See Bass*, 99 S.W.3d at 885; *see also* Model Bus. Corp. Act § 7.46(3) (1999).

Applying this standard to the facts of this case, we conclude the trial court did not err when it determined that Brady brought her shareholder derivative action "without reasonable cause." Brady alleged that Calcote improperly took a bonus, but later, the SLC discovered she had no evidence to support this claim other than her own allegations. Next, with respect to the preliminary financial information provided to the shareholders at the January 15, 2002, meeting, Brady alleged no damages suffered by the Bank and had no facts to support that the shareholders understood that such figures were audited figures.[8] Third, other than Brady's allegations which are rooted in hearsay, the SLC found no facts to support the allegation that Calcote revealed confidential corporate information to a third party. Fourth, no formal "agreement" existed to preclude the directors from reassessing their decision to defer the *de minimus* director's fees. Finally, no facts existed to support Brady's allegation that customers of Dunn's automobile dealership received any preferential treatment when obtaining financing from the Bank. Brady relies on the report by The Kelley Group stating that the discrepancies between the financial statement provided to the FDIC and the figures provided to the shareholders warranted further investigation. Such report does not state that the discrepancies warrant a shareholder derivative suit. Under the circumstances of this case, we hold that the trial court did not err when it determined that Brady brought her shareholder derivative action "without reasonable cause." Further, Brady argues that the statute states a trial court "may" award a defendant his or her expenses and that the trial court abused its discretion when it did so in

---

[8] As noted above, Jones and Duncan on the SLC concluded that most parties familiar with business matters would not expect a corporation to have audited financial statements only fifteen days after a year is over. Additionally, Jones stated in his deposition that such audited financial statements contain a certification from a certified public accounting firm showing on the document's face that it represents audited figures.

this case. After our review of the record, we cannot say that the trial court abused its discretion when it awarded the defendant directors their expenses and attorney's fees.[9]

## Special Litigation Committee Fees

Finally, Brady argues that the trial court erred when it assessed the fees of the SLC against her.[10] Again, the pertinent statute is section 48-17-401 of the Tennessee Code which provides "[o]n termination of the proceeding, the court may require the plaintiff to pay any *defendant's* reasonable expenses (including counsel fees) incurred in *defending* the proceeding if it finds that the proceeding was commenced without reasonable cause." Tenn. Code Ann. § 48-17-401(d) (2002) (emphasis added). The SLC was appointed by the Bank and the Bank was responsible for the SLC's fees incurred in investigating Brady's claims. At no point was the Bank named as a defendant in Brady's shareholder derivative action. Therefore, under the plain language of the statute, we reverse the trial court's award of the SLC's fees assessed against Brady.

## Conclusion

For the reasons stated above, we affirm the trial court's approval of the Special Litigation Committee's report and recommendation and the trial court's award of the defendant directors' attorney's fees and expenses. We reverse the trial court's award of the Special Litigation Committee's fees. Costs of this appeal are taxed equally to Appellees, James Donald Calcote, Cordell Anderson, Rebecca Burnett Atkinson, Georgia Bernice Duncan, William Landon Dunn, Danny Ray Forkum, Laverne Ray Storie, Jimmy Dow Taylor, James Howard Threet, Kathryn Stockton Williams and Michael Stone, and Appellant, Ronda G. Brady, and her surety for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE

---

[9] Brady additionally relies upon this Court's decision in *Hannewald v. Fairfield Communities, Inc.*, 651 S.W.2d 222 (Tenn. Ct. App. 1983). In that case, the court cites former section 48-718 of the Tennessee Code which provides that "[i]f the [shareholder derivative] suit is successful, *in whole or in part*, or if anything is received by the corporation for profit as a result thereof, the court may award the complainant or complaints reasonable expenses and reasonable attorney's fees . . . ." *Id*. at 229 (citing Tenn. Code Ann. § 48-718) (emphasis added). Our review of the current Tennessee Code reveals no such comparable section. Even if such section did exist and this Court were to construe Brady as successful in part, we could not say the trial court abused its discretion when it did not award Brady a portion of her attorney's fees and expenses.

[10] After researching this topic, we have been unable to find any case law discussing the award of special litigation committee fees.